Danielle Bettencourt, U.S. Department of Agriculture Here we are on an appeal on a case involving the United States Forest Service cancellation of her 2016 term grazing permit for alleged unauthorized grazing of livestock on federal lands outside her terms of her permit. Before I get into the meat of some of that argument, I think one of the issues that has to be addressed first and what was raised by the appellees in this case was whether in fact this case has now become moot and whether this court has jurisdiction because the terms of the permit have expired dated December 31st of 2025. As an initial argument, we have raised that we believe that 10-year term permit should have been going on into this year and not have concluded until December of 2026. We do understand that in the actual permit itself, the date does state December 31st, 2025. However, by statute and regulations at 43 U.S. Code Section 1752A, it does state that a grazing permit shall be for a term of 10 years. The same type of language is in the regulations at 36 CFR. And so you think that that gives you an additional couple of months because it was signed in what? It was initially signed in December or was it April? The permit from 2016 was signed in December of 2016, December 20th, 2016. And so you think that she gets until that date? Correct. Ten years later, 2026 in terms of a 10-year permit. As I read the regulations, it looks like the regulations contemplate that even if a permit has been terminated by time, that if the Forest Service hasn't gotten around to renewing it, that there is a presumption of continuation until the Forest Service completes the need and sort of puts the burden on the Forest Service to get that right. Why isn't that the stronger argument for your mootness rather than that the Forest Service has somehow made a scrivener's error and that you're entitled to additional time? Your Honor, I do believe that is our stronger argument and we did make that in briefing as well. I just wanted to hit this initial one first to put the point to the fact that she believed that it didn't expire until 2026. And it kind of was consistent with the fact that her prior permit wouldn't have expired before she signed this 2016 permit either. And do you know, I mean, I don't, this may not be in the, I mentioned this is not in the record, but have they given the permit to somebody else as far as you know? It is not in the record as far as I know that they have not, but I have not seen anything indicating otherwise. I think they haven't made us, let us know. And I take it you're under, I guess it's 1752 C1. If the permit had simply expired rather than having been revoked as it was here, you would have priority for renewal, is that right? That's correct. So our other argument aside from whether we go by the term and the date written in the actual permit is the fact that this court can still grant some type of relief to Ms. Perkins. Whether it is that the permit had expired in 2025, the fact is that there is a statutory right to renewal and also first priority for that renewal for a current permittee under the statute. As well as the fact that, as your Honor was indicating, part of that section also allows for your prior terms and conditions to continue on while an environmental assessment is completed through the process to get your new permit. Depending on whether new terms and conditions are issued or whether you remain under the same terms and conditions. So our argument is obviously the fact that this case isn't moot. You can still grant effective relief if you determine that the cancellation decision was arbitrary and capricious. You can set it aside and that would wipe the slate clean for Ms. Perkins. And she would fall within that requirement under 43 U.S. Code 1752 that the lands are available for grazing. That she is in compliance with the permit and terms and conditions and the rules and regulations. And then all she would have to do is accept the new terms for the permit in order to be given first priority for receipt of that grazing permit. I also wanted just to address some of the additional case law that was cited out in the Tenth Circuit regarding grazing permit expirations becoming moot. This would be the McKean v. U.S. Forest Service as well as Wallace v. Bureau of Land Management. I think they're distinguishable from our case on the basis that while those grazing permits had expired, the difference was in fact that the permittees had received new grazing permits were under additional terms and conditions as opposed to in our case where Ms. Perkins currently does not qualify for a new permit due to it being canceled for noncompliance. After addressing the mootness, I would like to direct to the rest of our argument in terms of why this decision should be set aside as arbitrary and capricious and not based on a rational explanation. I think in the large part, both the Forest Service decision as well as the lower court's decision focused a lot on the alleged unauthorized grazing of Mr. Jerry Vosnick, who is Ms. Perkins' son. He has his own herd of cattle. He operates his own business separate from Ms. Perkins. However, in a few of the past seasons, in terms of when they were grazing, it's been a few years, but back in 2021 specifically, he was allowed to graze under Ms. Perkins' permit through an annual operating instruction. And that authorization was temporary in the sense that it only allowed for two months. Per the terms of the permit of Ms. Perkins, she's only allowed to let livestock owned by her to graze on her allotment unless otherwise approved by the Forest Service. And then she's further required to make sure anything, any cattle she's owned or controlled stay out of unpermitted areas. However, the U.S. Forest Service is arguing that that temporary authorization of allowing to have his cattle under her permit to help her with the grazing operations, that now somehow he was attached to her permit for the entire grazing year, so the entire 12 months. I don't find that there's anything in the statutes, regulations or otherwise that would allow for this to occur. More specifically, annual operating instructions aren't even statutorily or regulatory required. They are something that are done to help allow for temporary changes in the number and kind of class of livestock and your grazing management, as well as seasons of use and also to help implement your allotment management plan and your actual grazing permit. But nothing in any of that type of, whether it's the Forest Service handbooks or any of regulations or otherwise, insinuate that an AOI has some broader impact on your permit than that. So even if we disregard for a moment all of his cattle and say that they're not attributable to Ms. Perkins, the agency pointed to some evidence that her cattle were involved. I'm thinking specifically of the photographs of some of the cattle at Verde River and then the visitor logs from the cement plant that suggested that she was coming and collecting them. So maybe you can address those pieces of evidence. Yeah, I think one of the major issues was the fact that that was never raised even before we got in front of the administrative appellate court. It was raised during the oral argument at that level that they did capture photographs or allegedly photographs of Ms. Perkins' cattle. She has long taken the position that her cattle were not with Jerry's cattle at the time. And that the two that were captured on some game cameras, that she had gifted them to Jerry back when he was younger. And he just never rebranded them. I don't know how else to raise the argument aside from what Ms. Perkins is claiming. How do you address the evidence at the cement plant? The cement plant calls and says your cows are over here. Some of them appear to be Jerry's, some of them appear to be hers. And her names show up in the logs. And some of her people show up in the logs. And so how do we address that? I think I would address it first in the fact that generally with the logs themselves. One, Ms. Perkins has denied that the cement plant was calling or telling her cattle were in their private property. Two, her cattle were in, she has, we've produced evidence showing that her cattle were in completely different locations. Private property, not even close to the cement plant property. And you're able to prove that all of her cattle, that all of her herd was there? None of her herd had wandered over here? That's correct. The cement, the people at the cement plant said they called her and that somebody from her group, either her personally or somebody else would come over and pick up the cattle. Ms. Perkins doesn't have any employees, Your Honor. The only one that has helped her in the past is Mr. Voschnick, her son. But he does have his own herd and his own operations and they're not a part of her operations. They're completely separate and distinct. What we have in the record is earlier when they talked to somebody from the cement plant factory was that they had called Jerry. Not that they were calling Silky. When he was then interviewed by a law enforcement officer with the Forest Service, they stated that they called both when issues arose. But Ms. Perkins has indicated she never received a phone call. And what do the logs say? The logs identify various, they say Perkins or Perkins' hands or Cruz or Mr. Voschnick or his father who is not married to Ms. Perkins any longer or hasn't been at that time. I don't, they don't give you any more information than that. And that is not anybody, that is not them signing in. It's somebody else who's writing that information down. They're not the ones who physically signed them in. Even the vice president at the Phoenix cement plant said that that doesn't clearly show that Ms. Perkins was actually the person who was going in through there. We're not retrying the case. We're here on appellate review under arbitration, arbitration is on the line, capricious, arbitrary and capricious standard. And you can contest the factual findings and you say, well, they shouldn't have, you know, the cement plant notations were incorrect. But it was evidence that it seems to me it was not irrational for someone to conclude that there was cattle appropriately attributed to her found raising where they weren't supposed to be. That was the basis for the action. At this stage of the game to say, well, that decision was wrong because she didn't have any hired hands or somebody at the cement plant must have made an erroneous understanding or noted something down wrong. I mean, that really is kind of missing the point for what we're doing here today, I think. Where am I wrong about that? I think what we're arguing, Your Honor, is is not just the facts alone, is is the fact that there is not substantial evidence in the record or. A reason to reach that conclusion, we have to discount the evidence that was cited and has to get to the point of deciding, well, the cement plant notation was incorrect, but I don't know that that's something we're in a position to do. We're not we're not the trier of fact. So I'm sympathetic toward the situation, but I don't know that this is the place where we can take up the kind of questions you'd like to take up. And I appreciate that, Your Honor, and I do would also argue on the Administrative Procedure Act at all levels. It's a de novo review where you can look at everything, including the facts in the case. Well, we can look at everything, but the standard is not de novo. We're not we're not the decider in the first instance. We're deciding based on a pretty deferential standard. Did you want to reserve the time? Thank you. Mr. Capps. Good morning. May it please the court. My name is Noel Capps. I'm in USA in Phoenix. I'll be presenting on behalf of the government. You'll have to speak up just a little bit, counsel, so we can hear you. Yes, Your Honor. This case and appeal became moot upon the expiration of the subject term grazing permit by its plain terms on December 31st, 2025. The requested revocation and enjoyment of the cancellation decision would afford no effective relief because Ms. Perkins' right to graze expired when the permit expired. There is no present life controversy. The arguments raised against mootness are both procedurally and substantively deficient. Procedurally, they're deficient because each states a new claim that was not raised before and exhausted below. For example, the alleged scrivener's error is a new claim seeking to modify the permit, a contract, to add an additional year to the expiration of the permit, the permit term, that is 180 degrees from the express terms of the permit itself, which facially stated December 31st, 2025. I'm not sure that's something that, I mean, you can call it a scrivener's error, but basically we've got this agreement. And I recently entered into a lease agreement that actually had the wrong unit number down. And we all understood it was the wrong unit number. And so I think the question here is, okay, we've got this agreement. Is that a plausible interpretation? Whether it is or it isn't and so forth, it's something on the table that suggests that maybe this isn't an entirely closed controversy. The agency's position is that there is no ambiguity here. Term grazing permits are issued, shall be issued for a term of 10 years, not more. The argument that would put it out to the end of this year would violate statute and regulation by making the term of the permit in excess of 10 years. See, that's an argument you can make. But defining the controversy as moot right from the get-go, I have more difficulty with. And we have the additional factor that was discussed when your colleague was at the lectern as to whether there's an understanding or an expectation that if you've had a permit and it expires in normal course, you've got a lead on getting a permit for the same territory thereafter. And why wouldn't that be a basis to make this a live controversy? Substantively and with all due respect to my colleague, the agency's position is that view is wrong. By statute and regulation, that right of an existing permittee to first priority for issuance of a new permit is conditional. It's not automatic. It's conditional upon that permittee being in full compliance with all terms and conditions. But isn't that a little circular for us, counsel? We're here today to try to figure out whether the determination that she was not in full compliance with the rules and regulations is arbitrary and capricious. And that's a very narrow standard. It is, but then we should be arguing about whether it's arbitrary and capricious, not arguing about whether it's moot, because the whole thing feels quite circular. Bottom line as to mootness, the agency's position is set forth in its briefing. I would also add that to the extent that the court is troubled by the ambiguity, to the extent that the court views there's ambiguity around either of the issues that are raised for it against mootness, that that would be frankly all the more reason to dismiss on grounds of mootness, because we're here on an incomplete record. But just to complete the point on the 1752C1 priority, is there any reason that she wouldn't be entitled to that other than the determination by the agency that is under review here? Procedurally, if the cancellation decision were revoked, it does not undo the past noncompliance or historical noncompliance. She would have to submit a new permit. And in that new application, she would have to submit a new application. And in that application process, agency practice is that the reviewing officer would look at among a lot of different factors, including compliance history. And while compliance history is not determinative, if the officer reviewing that application for a new permit deemed that the permit compliance history was unsatisfactory by agency practice, that permit, that new permit, can't be issued. But do you, I mean, is there a reasonable possibility that the compliant or that the officer making that decision would reach a different conclusion in the case of somebody whose permit had been revoked, if we were to, because of the action at issue here, than someone who's hadn't but had whatever other things in the past there are? Well, to be clear, I'm not... Might it make a difference? I'm not suggesting any predetermination or forecasting. Well, that's fair. But the problem is that if there is some realistic possibility that the decision in this case would make a difference to what the party's future rights are, then it's not moot.  And I'm not... It seems like you're... I mean, I appreciate that you're being careful in not saying what the agency would or would not do. But if you can't tell us that no matter what happens here, she's not getting another permit, then it seems like this case might make a difference and then that means it's not moot. All I'm suggesting here...  Your Honor, yes. Moving on to the merits, the district court's judgment should be affirmed because it properly found that the cancellation decision was lawful and based upon substantial evidence. With respect to that part of the cancellation decision focusing on the prior Verde River Corridor violations, the cancellation decision was the culmination of a years-long effort to work with the permittee to get her into compliance and get her to stay in compliance through progressive permit actions. Unfortunately, that simply did not happen. And at the relevant time, plaintiff was already under a 25% suspension decision as of March 31st, 2021, because of a frequent recurring pattern of noncompliance by having cattle under her permit being found in the Verde River Corridor. This is something that repeats itself with respect to the subject notice of noncompliance leading to the subject cancellation decision when, again, on multiple occasions, although under the permit and the annual operating instructions, she was not to have any cattle on Forest Service lands after April 30th of 2021. Her cattle were documented or otherwise determined to be, based upon substantial evidence, on National Forest Service administered property beginning on or about May 18th, 2021 through middle of December of 2021. And with respect to the Jerome allotment, which had been closed to grazing since 2008, there was strong circumstantial evidence that plaintiff and cattle under her permit were involved with substantial unauthorized grazing on the northern portion of the Jerome allotment sometime between mid-April of 2021 and mid-September of 2021. With respect to the types of evidence supporting the underlying decision, I would point the Court to the responsive statement to the appeal and the oral presentation outline that are part of the record, 2 ER 47-87 and also 2 ER 158-189. I would also point to the Court that when the notice of noncompliance was issued in February of 2022, Ms. Perkins was given an opportunity to provide substantive response. And she did, but it was not substantive. It was incomplete. And it came in two parts. It came on March 3rd and it came on March 17th. And for the remaining approximately six months up until the time the cancellation decision was issued on August 8th of 2022, no additional information was provided for the agency's consideration. So what the agency had in front of it was the evidence of the substantial grazing of Jerome allotment. It had in front of it the substantial evidence of the unauthorized grazing on the Verde River corridor, including photographs of plaintiff's cattle documented once on July 2nd of 2021 and a second time on November 3rd of 2021. She says that those were cattle that had been transferred to her son. So what do you say to that? Well, those arguments were never brought to the agency's attention. But during the administrative appeal process, they were. And the agency just didn't simply disregard it. They looked at it and made a determination that those, first, it's not disputed that the cattle bore her brand. Second, under Arizona statute, they're deemed to be under the ownership of the brand that they bear and that the permit required expressly that the permittee immediately notify the agency if there was any change at all in the ownership status of the cattle. That never occurred. And for that reason, even were the court to accept the argument that the Vaginic cattle were not under the permit or in addition to that, that the plaintiff gifted these cattle at some unknown time in the past, we are still left with a significant permit violation under part two of the permit, again, requiring that the permittee immediately notify the agency of a change in brand ownership. So there's still noncompliance and significant noncompliance that led to well-documented impacts of grazing on federal property that should not have occurred and were in contravention to the express terms of the permit. I'm sure it's not in the record, but do you know what the land in question or how it's being used now? Has a new permit been issued? A new permit has not been issued. And with that, Your Honor, I'm happy to answer any other questions. It appears there are none. But the agency would respectfully request that the appeal be dismissed on mootness grounds or alternatively that the judgment of the district court be affirmed. Thank you. Thank you. Thank you, Your Honor. I think I would just want to follow up on a few points in terms of that, one, that Ms. Perkins didn't respond when she first received the notice of noncompliance. You know, he does admit that she did respond, but it wasn't what they wanted. But quite clearly, she's denied that those cattle were ever her responsibility or that it was her cattle, in fact, doing the unauthorized grazing. That was her response. Her response of not being able to give more information in regards to what was happening on the Jerome allotment next to the cement plant factory has long been the position was because she was not involved at all. She was not there. She was not letting her cattle be grazing on the Jerome allotment. And quite frankly, we believe the visitor logs aren't conclusive of that, nor do they support a reasonable explanation that that was, in fact, her that was involved in those situations or that unauthorized grazing. My time is short. But the only other thing I would have to point out, too, in terms of the brand issue, case law out of Arizona also recognizes that the brand is not conclusive proof that ownership or proof thereof can be made in no other way, but that it can be made in other ways aside from just having the brand. With that, I would ask that this Court set aside the agency's decision and find in favor of the appellant. Thank you. Thank you, counsel. And we thank both counsel for their helpful arguments. The case is submitted, and we are adjourned.
judges: CLIFTON, BYBEE, MILLER